**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| PORTLAND REGENCY, INC. AND TOP OF EXCHANGE, LLC,<br><br>      PLAINTIFFS<br><br>V.<br><br>RBS CITIZENS, N.A. AND CITIZENS BANK NEW HAMPSHIRE,<br><br>      DEFENDANTS | CIVIL NO. 2:12-CV-408-DBH |

**DECISION AND ORDER ON DEFENDANTS' AMENDED MOTION
FOR SUMMARY JUDGMENT IN PART AND MOTION TO DISMISS IN PART
AND MOTION TO EXCLUDE PLAINTIFFS' EXPERTS**

Corporate borrowers and a bank entered into large secured commercial loan transactions when interest rates were higher than they are now.[1] For each transaction, the bank had the borrowers agree to a floating interest rate, coupled with an interest rate swap, so as to generate a synthetic fixed interest rate.[2] The

---

[1] The borrowing parties are related and are Top of Exchange, LLC and Portland Regency, Inc. The banking defendants are Citizens Bank New Hampshire and its successor RBS Citizens, N.A. For simplicity I refer to them respectively as the "borrowers" and the "bank."

[2] "An interest rate swap is a transaction in which one party pays an amount calculated by reference to a specified rate of interest and a hypothetical principal amount (sometimes called the 'notional amount') while the other party (sometimes called a 'swap counterparty') pays an amount calculated by reference to a different rate of interest based on the same notional amount. . . . [T]he most common type of interest rate swap involves one party making a payment based on a fixed rate of interest and the other party making a payment based on a floating rate of interest. When a borrower enters into an interest rate swap, it most frequently makes payments to the swap counterparty based on a fixed rate and receives payments from the swap counterparty based on a floating rate.

  An interest rate swap will often be obtained by a borrower when its loan is based on a floating rate of interest such as LIBOR (the London interbank offered rate) and the borrower does not want to take the risk associated with future increases in the floating rate. By carefully structuring the interest rate swap, the borrower can eliminate most of the risk of increasing

borrowers remain current on all their obligations, but they have wanted for some time to prepay in full and thereby extricate themselves from three commercial mortgage loans and two swap agreements that are interest-unfavorable. The borrowers claim that the bank is signaling that it will charge far too much (around $5 million) in breakage fees for terminating the interest rate swaps. As a result, the borrowers sued for a declaratory judgment about the proper fees, and for misrepresentation damages caused by the high quotes that deterred them from prepaying and terminating. During the lawsuit, the borrowers have narrowed their declaratory judgment request and now want me to declare that, in calculating the swap breakage fees, the bank is obligated to take into account the new investment opportunity that it will obtain from the repayment of the principal balance of the loan. The bank has moved for summary judgment and to dismiss. Following oral argument on February 23, 2015, I **GRANT** the bank's motion for summary judgment on the misrepresentation claim (Count III) and on the declaratory judgment claims (Counts I and II) as to the bank's obligation to offset the reinvestment value of prepaid principal against the swap breakage fees. I also **GRANT** the bank's motion to dismiss the remainder of the declaratory judgment claims in Counts I and II because the borrowers no longer press them

---

interest rates. At the same time the borrower gives up the savings that otherwise would be achieved if floating interest rates declined." Steven R. Davidson, Commercial Real Estate Financing: Strategies for Changing Markets and Uncertain Times, Interest Rate Hedging Products, ST053 ALI-CLE 657 (June 14–15, 2012) (Westlaw); see also S. Lawrence Polk & Bryan M. Ward, A Guide to the "Regulatory No Man's Land" of Over-the-Counter Interest Rate Swaps, 124 Banking L.J. 397, 399–400 (2007); Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n, 322 F.3d 1039 (9th Cir. 2003).

and because I conclude that they are not ripe for adjudication in any event. This outcome **MOOTS** the bank's motion to exclude the borrowers' experts.

## FACTS

I refer only to undisputed facts and the documents that the parties agree govern the transactions. The bank delivered a financing proposal for a commercial real estate mortgage loan to the borrowers dated June 15, 2006. June 15, 2006 Financing Proposal (ECF No. 141-5) ("2006 Financing Proposal"). The 2006 transaction was structured so that it included, among other components, a loan agreement, a promissory note for $9,430,000 with a variable rate of interest secured by a mortgage and security agreement, and an interest rate swap agreement that had the effect of creating a synthetic fixed interest rate for the borrowers. Pls.' Statement of Additional Facts at ¶¶ 143, 150, 151 (ECF No. 139) ("Pls.' SAF"); Defs.' Reply to Pls.' Statement of Additional Facts at ¶¶ 143, 150, 151 (ECF No. 151) ("Defs.' RSAF"). To document the interest rate swap agreement, the parties used the so-called ISDA Master Agreement, together with a Schedule and Confirmation.[3] Pls.' SAF at ¶ 150; Defs.' RSAF at ¶ 150. The swap had the same maturity date as the loan, and the starting "notional" amount of the swap on which interest was calculated matched the starting principal of the loan. June 22, 2006 Promissory Note (ECF No. 141-7) ("2006 Promissory Note"); June 23, 2006 Interest Rate Swap Confirmation at 1, 5 (ECF

---

[3] The International Swap Dealers Association created the ISDA Master Agreement. It is "'the industry standard in general use worldwide for formalizing derivatives trading arrangements.' Counterparties regularly use the ISDA Master Agreement, adapting it to their purposes through specifications set forth in separate schedules and confirmations of individual transactions." Polk & Ward, supra note 2, at 400 (2007) (footnotes and case citations omitted).

No. 141-25) ("2006 Confirmation"). The notional amount decreased on a schedule commensurate with projected principal payments on the mortgage loan. 2006 Confirmation at 5. Prepayment fees were specified on the Promissory Note, and "breakage" or early termination fees on the swap agreement. 2006 Promissory Note at 3; 2006 Confirmation at 3.

In September 2007, the borrowers and the bank executed documents further financing the borrowers. Pls.' SAF at ¶¶ 164, 176; Defs.' RSAF at ¶¶ 164, 176. The bank issued mortgage loans in the amounts of $8,500,000 and a restatement of a 2003 loan in the amount of $6,256,000. Pls.' SAF ¶¶ 167–68; Defs.' RSAF at ¶¶ 167–68. Like the 2006 transaction, the 2007 transactions were structured to include, among other components, one new promissory note with a variable rate of interest and mortgage and security agreement,[4] an amended promissory note with a variable rate of interest for the restatement of the 2003 loan, and an interest rate swap agreement.[5] Pls.' SAF ¶ 198; Defs.' RSAF ¶ 198. For the interest rate swap on this occasion, the parties referred back to their 2006 ISDA Agreement and the related Schedule, but with a new

---

[4] Actually, the parties amended the 2006 mortgage and security agreement to encompass the mortgage loan obligations arising under the 2007 transactions. Sept. 10, 2007 Amendment No. 1 to Mortg. and Sec. Agreement and Collateral Assignment of Leases and Rents (ECF No. 141-19).

[5] The borrowers refer to one interest rate swap agreement associated with the 2007 mortgage loan and the 2007 restatement of the 2003 mortgage loan, Pls.' SAF ¶ 198; however, the bank inconsistently makes reference to "2007 TOE and Regency interest rate *swaps*" and "*confirmations*." Compare Defs.' RSAF ¶ 195 *with* Defs.' RSAF ¶ 196 (emphases added). The parties have introduced only one 2007 Confirmation letter as an exhibit to the parties' summary judgment briefs. Sept. 17, 2007 Interest Rate Swap Confirmation (ECF No. 141-27) ("2007 Confirmation"). This Confirmation is addressed to both Top of Exchange and Portland Regency and lists as a notional amount the combined principal of both the 2007 loan and the restatement of the 2003 loan. Id. at 1, 7. For this reason, and for clarity purposes, I refer to a singular 2007 interest rate swap, as I understand the bank's reference to multiple 2007 swaps as either a typographical error or an issue of semantics.

4

Confirmation, to create a synthetic fixed interest rate. Pls.' SAF ¶ 196; Defs.' RSAF ¶ 196. Once again, the maturity of the swap matched that of the loans, and the notional amount on which interest was calculated matched the principal of the two loans combined. Sept. 10, 2007 Amended and Restated Promissory Note (ECF No. 141-14) ("2003-2007 Amended Promissory Note"); Sept. 10, 2007 Promissory Note (ECF No. 141-18) ("2007 Promissory Note"); 2007 Confirmation at 2, 7.

In September of 2011, the borrowers asked the bank how much was due if the borrowers prepaid their transactions in full. Pls.' SAF ¶ 339; Defs.' RSAF ¶ 339. The bank said that the "penalty" to "break" the swap transactions would be "around" $5 million. Pls.' SAF ¶ 341; Defs.' RSAF ¶ 341. In October 2012, the borrowers again asked the amount due if they terminated their transactions. Pls.' SAF ¶ 348; Defs.' RSAF ¶ 348. The bank replied that the cost would be in excess of $4.2 million. Pls.' SAF ¶ 349; Defs.' RSAF ¶ 349. The bank's quotes were so high that the borrowers say they were unable to prepay the mortgage loans and seek more favorable financing from a new lender, or other business opportunities in which they were interested. Pls.' SAF ¶ 353.[6] The 2006 and 2007 transactions all remain in place and current in all respects. Pls.' SAF ¶¶ 159, 199; Defs.' RSAF ¶¶ 159, 199.

---

[6] The borrowers have not argued that either the loan prepayment provisions or the swap breakage fees here are unenforceable penalty clauses. There is, in the caselaw and commentary, discussion over whether loan prepayment clauses are penalty clauses, liquidated damages clauses, or merely an alternate way of fulfilling the contract. See, e.g., River E. Plaza, L.L.C. v. Variable Annuity Life Ins. Co., 498 F.3d 718 (7th Cir. 2007); Megan W. Murray, Prepayment Premiums: Contracting for Future Financial Stability in the Commercial Lending Market, 96 Iowa L. Rev. 1037 (2011).

## PROCEDURAL HISTORY

The borrowers filed their lawsuit in state court. The bank removed it to this court based upon diversity of citizenship. The state court complaint and a First Amended Complaint in this court asked for a declaration of the amount of Prepayment Fees and Early Termination Fees as well as damages for misrepresentation. Pls.' First Am. Compl. at 15 (ECF No. 24) ("Pls.' FAC"). The bank moved for summary judgment and to dismiss, arguing that it has no obligation to reduce the swap breakage fees by the reinvestment value of the prepaid principal, that otherwise the declaratory judgment claims are not ripe, and that the summary judgment record refutes the borrowers' misrepresentation claims. Defs.' Amended Mot. for Summ. J. in Part and Mot. to Dismiss in Part (ECF No. 131) ("Defs.' SJ Mot."). As the case has developed, the borrowers have dropped their initial request for an actual determination of fees due. First, they narrowed their declaratory relief request to a determination of the proper methodology to follow in determining the fees. Pls.' Opp'n to Defs.' Mot. for Summ. J. in Part and Mot. to Dismiss in Part at 49 (ECF No. 138) ("Pls.' Opp'n to SJ"). Then most recently at oral argument, they narrowed their request still further, to a declaration only that the bank must offset the investment value of the early principal payment against any breakage fees it claims resulting from termination of the swap agreements. Hr'g on Defs.' Summ. J. Mot. (Feb. 23, 2015). But the borrowers have not cross-moved for summary judgment because they maintain that the documents are ambiguous and that the factfinder must hear evidence of the parties' intent in this regard. Pls.' Opp'n to SJ at 1.

## ANALYSIS

### (A) *The Declaratory Judgment Claims*

The bank seeks summary judgment[7] on the borrowers' claim that in calculating swap breakage fees the bank must subtract the reinvestment value that it receives from the prepaid principal. The bank maintains that the agreements between the parties have no such requirement. Although the parties have devoted substantial attention to whether each respective loan and swap constitutes an integrated transaction and whether prepayment of a loan requires termination of a swap or vice versa, I assume for purposes of the motion that, as the borrowers contend,[8] the answer to both questions is yes. I turn to the contractual language.[9]

At the outset, the commitment letters explicitly promised both prepayment fees for the mortgage notes and breakage fees for the swap. The 2006 Financing Proposal states under "Interest Rate": "Any principal prepaid that is subject to a SWAP, CAP or FORWARD START or other Derivative contract will be subject to prepayment penalties *and other costs that are normal and customary (a.k.a. Breakage Fees) for derivatives.*" 2006 Financing Proposal at 2 (emphasis added).

---

[7] The transactional documents vary in their choice of law provisions, ranging from Maine to New York to New Hampshire. But the choices do not conflict, and I am able to respect the choice of law for each document, although choice of law does not make a difference on the declaratory judgment dispute.

[8] The borrowers, in opposing summary judgment, argue that the loan agreements "incorporate the swaps by reference into the loans," Pls.' Opp'n to SJ at 35, and that "there are multiple provisions that demonstrate the loans and swaps could not be terminated separately." Id. at 39.

[9] Even assuming that the documents reflect integrated transactions, I still must examine the terms of all the documents to determine their meaning and the obligations they impose. BKB Props., LLC v. SunTrust Bank, No. 3:08-CV-00529, 2009 WL 529860, at *5 (M.D. Tenn. Mar. 2, 2009), aff'd, 453 F. Appx. 582 (6th Cir. 2011).

The language of the 2007 Financing Proposal is similar, although the amount of the loan prepayment penalty is different. Aug. 16, 2007 Financing Proposal (ECF No. 141-10). In turn, the mortgage notes as executed include both categories of fees. The 2006 Note provides:

> Borrower shall have the right to prepay the Loan in whole or in part, together with all delinquency charges, plus any LIBOR[10] Rate Loan Prepayment Fee *or any fees in connection with any Hedging Obligations*, as such terms are set forth and defined in <u>Rider A</u> to the Note [defining a swap as a Hedging Obligation] . . . and additional interest on the amount being prepaid equal to an amount based upon [a percentage starting at 3% of the amount to be prepaid and declining to zero as the Note matures].

2006 Promissory Note at 3 (emphasis added).[11] With respect to the LIBOR Loan Prepayment Fees, Rider A provides:

> When classified as a LIBOR Rate Loan, the Loan may be prepaid upon the terms and conditions set forth herein. The Borrower acknowledges that *additional obligations may be associated with prepayment, in accordance with the terms and conditions of any applicable Hedging Contracts* [defined in the Rider to include interest rate swaps].

---

[10] The borrowers have dropped the claim in the First Amended Complaint that a corporate parent of the bank improperly manipulated or distorted this rate. Pls.' SAF at ¶ 23.

[11] On this provision, the 2003 Note as restated in 2007 is similar in structure. Under "Permitted Prepayment," it states:
> Borrower shall have the right to prepay the Loan in whole or in part, together with all delinquency charges and any other amounts which may be due hereunder or under any of the Loan Documents at any time without any prepayment interest or premium unless refinanced with another lender, in which case Borrower shall pay to Lender additional interest ("Prepayment Interest"), in addition to all other amounts due under this Note, in an amount equal to one percent (1.0%) of the prepaid amount under this Note. *Notwithstanding the foregoing, the Borrower shall also pay any LIBOR Breakage Fee or any fees in connection with any Hedging Obligations, as such terms are set forth and defined in <u>Rider A</u>*. The Prepayment Interest is not intended as a penalty, but as compensation to Lender for the loss of its investment opportunity over the period remaining until the Maturity Date.

2003-2007 Amended Promissory Note at 3 (emphasis added). The 2007 Note has an identical provision. 2007 Promissory Note at 3.

8

Id. at 12 (emphasis added).

Turning to the swap documents, I observe that they describe the calculation of "breakage fees" for the swap part of the transaction, but they do not speak to the value of the bank's ability to reinvest prepaid principal as part of that calculation. The ISDA master agreement has no language that suggests that such an offset is required. Instead, the ISDA master agreement is devised for use in a variety of transactions, including those where the interest rate swap agreement is with a third party, not the lender. See Thrifty Oil Co., 322 F.3d at 1043 (describing uses of ISDA master agreement). In those instances there would be no return of principal to the swap party, and it is therefore not surprising to find no reinvestment offset language in the ISDA master agreement.[12] Neither the bank nor the borrowers offer an explanation for why the parties executed variable-rate mortgage loans and interest-rate swap agreements, rather than execute fixed-rate mortgage loans in the first place.[13] But in executing the swap, the borrowers agreed to pay a fixed rate, thus avoiding the vagaries of interest rate fluctuations. And the bank, while also insulating itself from adverse changes in interest rates, faced the risk that if rates increased above the fixed rate, the bank would not see the benefit of this interest-rate environment. The benefit of the bank's bargain on the swap agreement has

---

[12] Indeed, theoretically even in a two-party transaction where the lender and swap party are the same, a lender might want to syndicate the loan but keep the swap, or a borrower might buy its way out of the swap while maintaining its loan with a floating rate. In either event, there would be no prepaid principal to reinvest.

[13] The borrowers say simply that the "execution of the interest rate swap was a condition" of the 2006 and 2007 loan transactions. Pls.' SAF at ¶ 144; 173.

9

nothing to do with payment of principal, but with whether interest rates go up or down.

The documents tailored to the 2006 and 2007 swap agreements, the Confirmations, each provides that if there has been no default the borrowers may, with notice, terminate the swap. 2006 Confirmation at 3; 2007 Confirmation at 4. Then, they say, the bank as "Calculation Agent" must "determine a Settlement Amount in accordance with the provisions of the ISDA Master Agreement and provide a statement with respect thereto . . . ." 2006 Confirmation at 3; 2007 Confirmation at 4. Under the ISDA Master Agreement, "Settlement Amount" includes a party's "Loss,"[14] ISDA Master Agreement at 16 (ECF No. 141-23) ("ISDA Master"), and "Loss," in turn, is defined in part as

> [A]n amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position (or any gain resulting from any of them). . . . A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A Party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

Id. at 15. There is no reference here to reinvestment value of prepaid principal, and no reference to what the standard would be for determining such a value.[15]

---

[14] In the Schedule to the ISDA Master Agreement, the parties elected that upon early termination, the "payment measure" of "Loss will apply." ISDA Master at 9; June 16, 2006 Schedule to the Master Agreement at 2 (ECF No. 141-24).

[15] Is it a Treasury-flat calculation, or something else? As River East stated, "parties can (and apparently occasionally do) negotiate a discount rate that is different from the Treasury yield."

I conclude that even if these all are integrated documents and even if prepayment of the loans requires termination of the swaps, nothing in the documents or the transactions supports requiring a principal reinvestment offset in calculating the swap breakage fees.[16] The borrowers want to have a trial where the factfinder would determine what the parties' intent was in entering the transactions. The borrowers say that they entered these transactions believing that they were agreeing to a fixed mortgage interest rate, with no understanding that if they prepaid they would owe huge additional amounts to the bank. But the borrowers do not claim fraud in the inducement or mutual mistake between them and the bank so as to void their agreements. And in fact, the borrowers did obtain the advantage of a fixed interest rate that will last as long as they pay until maturity. But the borrowers' position on swap breakage fees ignores the fact that the fixed interest rate was synthetic, that they had agreed to an underlying variable rate, and that the swap transaction gave the bank any profit that resulted from the variable rate falling below the fixed rate (just as the bank would have lost if the variable rate rose above the fixed rate). That is the benefit

---

River East Plaza, 498 F.3d at 720. Here, I am furnished no information about discussions between the parties on that topic. Investments like commercial mortgages generally yield greater income than Treasuries, id. at 723, but they also involve greater risk.

[16] The bank asserts the same conclusion as to calculation of fees for prepaying the loans: "Nothing [in the loan agreement prepayment] terms . . . provides that the potential reinvestment potential of the returned loan principal should be calculated into the determination of any prepayment fee." Defs.' SJ Mot. at 26. I am not so sure. The parties have not discussed the meaning of language in Rider A to the 2006 Promissory Note addressing LIBOR breakage fees that requires, as an offset, consideration of the value of Treasury investments, arguably in a Treasury-flat manner as in River East. 2006 Promissory Note at 3-4. For unexplained reasons, the other two Notes do not contain that language. I am left uncertain whether the borrowers must pay only specified percentage prepayment fees in prepaying the 2006 Note, or whether the LIBOR breakage fee also compensates the bank for some portion of its interest loss. But that question is not before me.

that the bank seeks to preserve in its calculation of loss on the swap if the borrowers prepay, and the reinvestment value of the prepaid principal plays no role in that calculation. I find no ambiguity in the documents on this score and thus no basis to allow parol evidence to interpret them. Zavota v. Ocean Acc. & Guarantee Corp., 408 F.2d 940, 943 (1st Cir. 1969) ("oral evidence will not be received to create ambiguity where none existed before.").[17] The bank, therefore, is entitled to summary judgment on this claim.

Because the borrowers no longer press their request for a declaration as to the dollar amount of fees due or a description of the methodology to be followed, I grant the bank's motion to dismiss the remainder of the declaratory judgment claims on the basis that they are not ripe for adjudication. (I find those claims to be unripe in any event.[18])

*(B)* ***Negligent/Intentional Misrepresentation***

The borrowers' claim here is that the bank falsely quoted to the borrowers "prohibitively high" breakage fees associated with terminating the swap

---

[17] This principle is long-established under Maine, New York, and New Hampshire law. See Linscott v. Fernald, 5 Me. 496 (1829); Trustees of Freeholders & Commonalty of Town of Southampton v. Jessup, 173 N.Y. 84 (1903); Clark v. Wood, 34 N.H. 447 (1857).

[18] The "Loss" provision of the ISDA Master Agreement gives the bank limited discretion in determining its loss under the swap part of the transaction ("reasonably determine[d] in good faith") plus a role in deciding what elements to include, or whether to refer to relevant rates from leading dealers. ISDA Master at 15. It is apparent from the contract language, therefore, that a court cannot in the first instance and in the abstract determine the Loss on terminating the swap, because there is no pertinent termination date (the borrowers have not prepaid the mortgage loans or terminated the swap agreements), and under the Confirmations the bank first gets to determine its total losses and costs, albeit it must do so reasonably and in good faith. (Under the 2007 Confirmation, the borrowers must also determine their Loss, as the Confirmation designates that the Transaction is to be Terminated as if there were "two Affected Parties." 2007 Confirmation at 4–5.) Thus, the borrowers wisely stepped back from the relief they requested in their First Amended Complaint and no longer seek a dollar amount determination from this court. It is also apparent that a court cannot in the first instance determine the methodology because the agreements allow the bank first to determine what elements to include in determining its Loss.

12

agreements, FAC at ¶ 16, and that while the borrowers were "skeptical that the Bank could be calculating fees consistent with the parties' agreement," they "were required to conduct themselves *as if the Bank's statements were true . . .* because the consequence of proceeding otherwise were so severe." Pls.' SJ Opp'n at 47 (emphasis in original). Thus, the borrowers allege, the borrowers have suffered damage because they were "unable to pursue more favorable lending arrangements and other business opportunities because their assets and funds have been tied up in the . . . Transactions." FAC at ¶ 36. They make no claim that the bank was contractually obligated to quote the fees in advance and breached the contract in how it did so.

### *(1) Choice of Law*

As a threshold matter, the parties disagree over what law applies to the misrepresentation claim. *Compare* Defs.' SJ Mot. at 41 *with* Pls.' SJ Opp'n at 42–43. Maine, unlike New York,[19] does not require claims for negligent misrepresentation to include a showing of a "special relationship." The borrowers argue that they have been harmed in Maine and that Maine law applies to the tort; the bank argues that because the misrepresentation claims are "essentially contractual," Defs.' SJ Mot. at 41, the parties' selection of New York law under the swap agreements governs. Because Maine is the forum state,

---

[19] See Hudson River Club v. Consol. Edison Co., 712 N.Y.S.2d 104, 106 (2000) (Under New York law, "[a] claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another").

13

I apply Maine's choice of law rules to determine which state's substantive rules apply. York Ins. Co. of Me. v. Schultz, 307 F.Supp.2d 108, 111 (D. Me. 2004).

The borrowers have chosen to pursue tort relief, not contractual relief,[20] and questions regarding tort liability are "appropriately addressed pursuant to tort choice-of-law principles." State Farm Mut. Auto. Ins. Co. v. Koshy, 2010 ME 44, ¶¶ 21-23; see also Flaherty v. Allstate Ins. Co., 2003 ME 72, ¶¶ 11–22 (applying tort choice-of-law principles in a wrongful death case involving insurance coverage issues). For choice of law, Maine looks to the Restatement (Second) of Conflict of Laws. Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 42 (1st Cir. 2005). Under section 148 of the Restatement, the relevant consideration is whether the plaintiffs' action in reliance took place in the state where the false representations were made and received. Restatement (Second) of Conflict of Laws, § 148 (1971). If that is the case, the local law of that state determines the rights and liabilities of the parties, unless some other state has a more significant relationship. Id.

Here, the agreements regarding the mortgage loans and associated swaps were reached in Maine. The plaintiff borrowers were residents of Maine, conducted their business in Maine, and the properties—which served as collateral for the mortgage loans—are located in Maine. The borrowers allege that they relied in Maine and that they suffered harm in Maine. New York does

---

[20] A plaintiff is "both the author and the master of its complaint," and this principle "extends to plaintiff[s]' decision as to which causes of action to bring." Connectu LLC v. Zuckerberg, 522 F.3d 82, 93 (1st Cir. 2008).

14

not have a more significant relationship merely because the swap agreements are governed by New York law. I therefore apply Maine law.

### *(2) Elements of Claim: Reliance*

Claims for intentional and negligent misrepresentation, although clearly distinct,[21] "both require that the defendant have made a false representation of present fact and that the plaintiff justifiably relied on the representation as true." Kearney v. J.P. King Auction Co., 265 F.3d 27, 33–34 n. 8 (1st Cir. 2001) (construing Maine law). Therefore, like the parties, I do not distinguish the two for purposes of this discussion. See id. (finding it unnecessary to distinguish fraudulent and negligent misrepresentation for purposes of analyzing misrepresentation and reliance elements). Although ordinarily the reasonableness of a party's reliance is a question of fact for the jury, if no reasonable jury could find the party's reliance reasonable, a court may grant summary judgment. Rodi v. S. New England Sch. of Law, 532 F.3d 11, 15 (1st Cir. 2008).

The required reliance is directed to the *truth* of the misrepresentation. Kearney, 265 F.3d at 33–34 n. 8 ("that the plaintiff justifiably relied on the representation as true"); see also Restatement (Second) of Torts § 548 (1977) Comment (a) ("the recipient of a misrepresentation must rely upon the *truth of the misrepresentation itself*, and his reliance upon its truth must be a substantial

---

[21] One difference is the burden of proof associated with each. Under Maine law, in the context of an intentional misrepresentation claim, the burden of proof is heightened to the clear and convincing standard, Bradley v. Kryvicky, No. CIV. 07-109-B-S, 2007 WL 2710392, at *2 (D. Me. Sept. 13, 2007), whereas the burden of proof on a negligent misrepresentation claim is by a preponderance. Id. Under either standard, the borrowers fail on their justifiable reliance claim for the reasons that I describe in text.

factor in inducing him to act or to refrain from action.") (emphasis added). In response to the bank's motion for summary judgment that asserts, among other arguments, lack of reliance by the borrowers, the borrowers' evidence of justifiable reliance on the bank's calculations is distinctly qualified. The bank said in its statement of material facts: "Both [the borrowers and their principal] testified that they did not rely on them; that, indeed, they never believed that the indicative quotes were consistent with the correct assessment of Early Termination Fees." Defs.' Am. Statement of Material Facts at ¶ 122 (ECF No. 132). To that, the borrowers responded: "Qualified. The plaintiffs admit that they did not believe that the Bank's October 22, 2012 quotations of early termination amounts were correct,[22] but dispute that they did not act in reliance upon such quotations in deciding not to terminate their mortgages with the Bank. To the contrary, the plaintiffs directly relied upon the Bank, and did not pursue alternative financing options and other opportunities as a result." Pls.' Opposing Statement of Facts at ¶ 122 (ECF No. 139) (footnote added). In other words, the borrowers did not *believe* the bank's calculations, but claim justifiable reliance regardless of their disbelief. Specifically, the borrowers assert that they were "required to conduct themselves *as if the Bank's statements were true*, even if Plaintiffs had substantial doubts, because the consequences of proceeding

---

[22] The borrowers went so far as to communicate their mistrust of the calculations less than a month later. In November 2012, counsel for the borrowers wrote to the bank's Chief Executive Officer, "detailing his understanding . . . of the errors in the calculations provided by the Bank . . . ." Id. ¶ 117.

16

otherwise were so severe." Pl.'s Opp'n to SJ at 47 (emphasis in original).[23] This hesitancy to prepay the loans and terminate the swaps reflects the borrowers' concern that the bank might turn out to be correct in its interpretation of the contract and the resulting calculations. As their legal memorandum says: "certainty as to the fact [of the calculations' accuracy] was not attainable, without obtaining a definitive determination from the Court as to the meaning of the contracts concerning the methodology to use to determine the termination fee (an avenue Plaintiffs ultimately resorted to), because the Bank as the Calculation Agent had the duty and right to make the initial calculation of the termination fee." Id. at 47.[24] To treat that uncertainty over proper contract interpretation ("the meaning of the contract") as justifiable reliance on the *truth of false*

---

[23] I note that the borrowers' response to the bank's statement of material facts, in paragraph 122 and elsewhere, does not say that the borrowers admit disbelief of the 2011 bank quotation. But they also do not deny disbelief, or provide record support of belief in the 2011 statement. And nowhere do the borrowers state affirmatively that they did believe the 2011 quotation. On a motion for summary judgment, the burden remains with the party who must prove the claim at trial, Delgado v. Aero Inv. Corp., No. 13-1640, 2015 WL 899796, at *3 (1st Cir. Mar. 4, 2015), and here the borrowers have produced no evidence that they believed that the bank's statements were true.

[24] The borrowers cite Maine caselaw to the effect that a "party 'may justifiably rely on the fraudulent misrepresentation of [another] . . . without investigating the truth or falsity of the representation. Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him." St. Francis De Sales Credit Union v. Sun Ins. of NY, 818 A.2d 995 (Me. 2003); and Estate of Whitlock, 615 A.2d 1173 (Me. 1992). (Actually, the borrowers cite federal cases from this District that cite those Law Court cases, but I refer directly to the Maine cases.) St. Francis De Sales was a case where there was testimony that the defrauded credit unions' employees "did believe that the representations in the certificates were true, they relied upon the certificates in deciding to do business with [another entity], and they entrusted their property to [that entity] only after reviewing the certificates." St. Francis De Sales Credit Union, 818 A.2d at 1004. Estate of Whitlock was a case where beneficiaries of an intestate estate relied upon the personal representative's misrepresentation that he had investigated whether a challenged beneficiary was in fact related to the decedent, and the court ruled that "[t]he reliance was justified because plaintiffs did not know of its falsity, and its falsity was not obvious." Id. at 1176. Neither of these cases is like this case of outright disbelief in what the bank said, where the "reliance" is based solely upon the borrowers' fear that the bank's interpretation of the contract might turn out to be correct.

*statements by the bank* would extend Maine law beyond its current scope.  In the end, this dispute is over what the contractual documents mean.

## CONCLUSION

I **GRANT** the defendant's motion for summary judgment on parts of Counts I and II and **DISMISS** the remainder of those claims as unripe.

I **GRANT** the defendants' motion for summary judgment on Count III.

The defendants' motion to exclude plaintiffs' experts is **MOOT.**

**SO ORDERED.**

**DATED THIS 20TH DAY OF MARCH, 2015**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**